No. 24-13016-D

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

CHRISTOPHER DEWAYNE BONNER,

*Plaintiff-Appellant*,

v.

TIMOTHY WARD, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Georgia
No. 6:23-cv-00014-JRH-BKE (J. Randal Hall, C. J.)

## BRIEF OF APPELLANT

Kenneth E. Barton III
Georgia Bar No. 301171

Debra G. Gómez
Georgia Bar No. 300509

M. Devlin Cooper
Georgia Bar No. 142447

GÓMEZ LAW GROUP, LLC
1469 Oglethorpe Street
Macon, GA 31201
(478) 744-0905 (t)
(478) 845-3554 (f)
dgomez@gomezlawgroup.com

COOPER, BARTON, & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com

*Attorneys for Appellant*

Docket No. 24-13016
*Bonner v. Ward, et al.*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Plaintiff-Appellant Christopher Dewayne Bonner, by and through the undersigned counsel, and pursuant to Federal Rule of Appellate Procedure 26.1 and Rule 26.1 of this Court, hereby states that the following individuals and entities have an interest in the outcome of this case and/or appeal:

Barton III, Kenneth E.

Bobbitt, Trevonza

Bonner, Christopher Dewayne

Carr, Honorable Christopher M.

Cooper, Barton & Cooper, LLP

Cooper, Ashley A.

Cooper, M. Devlin

Estate of Christopher Dewayne Mathis

Georgia Department of Corrections

Georgia Department of Law

Glover, Majorie

Gómez, Debra G.

Gómez Law Group, LLC

Hall, Honorable J. Randal

Docket No. 24-13016
*Bonner v. Ward, et al.*

Hall, Joseph Leon

Henefeld & Green, P.C.

Henefeld, Paul

Holt, Ahmed

Jackson, Javel

Jackson, Reginald

Klingman, Austin

Milton, Shelley T.

Mendez, Lisa South

Milliken, Chadrick

State of Georgia

Ward, Timothy

Williams, Shambreyasha A.

Plaintiff-Appellant Christopher Dewayne Bonner further states that he is not aware of any information or parties required to be disclosed pursuant to Federal Rule of Appellate Procedure 26.1.

## STATEMENT REGARDING ORAL ARGUMENT

The dispositive issues in this case have been authoritatively decided by this Court and that of the United States Supreme Court.  According to the standards set forth in *Twombly*, *Iqbal*, and their progeny, a district court must accept the facts set forth in a complaint as true, and such pleading should survive a motion to dismiss for failure to state a claim if it alleges sufficient factual matter that states a claim for relief that is plausible on its face.  This Court, being able to review and determine the sufficiency of the pleading, along with the other facts and legal arguments that are being presented in the record, should be able to determine whether the district court erred in dismissing the claims, and the decisional process would not be significantly aided by oral argument.

As a result, Plaintiff-Appellant Christopher Dewayne Bonner respectfully submits that oral argument need not be permitted. In the event that the Court does issue notice for such oral argument, Appellant will participate willingly to aid the Court's adjudication of this matter.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ........................................ i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ................................................................................... vi

STATEMENT OF THE ISSUES .................................................................1

STATEMENT OF THE CASE .....................................................................2

  A.  Factual Background ..........................................................................2

    1.  Conditions of the Georgia State Prison ........................................2

    2.  Parties .........................................................................................6

    3.  The confinement and death of Christopher Dewayne Mathis ....................8

  B.  Procedural Background ..................................................................13

  C.  Standard of Review ........................................................................16

SUMMARY OF THE ARGUMENT ..................................................................17

ARGUMENT ...............................................................................................18

  A.  The John and Jane Doe Defendants Met the Limited Exception for Fictious Pleading and Should Not Have Been Dismissed. ...............................18

  B.  The District Court Abused Its Discretion in Finding that the Complaint Was a "Shotgun Pleading." ............................................21

    1.  None of the counts adopt the allegations of any other count. ....................22

    2.  The Complaint clearly indicates against which Defendants the claims are brought, and the specific acts and omissions leading to each Defendants' liability. ................................................................................23

  C.  Plaintiff's Allegations Concerning the Defendants Failure to Hire, the Conditions of Confinement, and the Failure to Protect Were Sufficient and Should Have Survived a Rule 12 Motion. .......................................25

    1.  The conditions of Mathis' confinement were created, in part, by the supervisory-Defendants' failure to provide adequate levels of staffing and supervision at GSP. .......................................................25

2.   The conditions of Mathis' confinement were a risk to his personal safety, and he was therefore subject to cruel and unusual punishment. .......................31

3.   Defendants failed to take any meaningful action to protect Mathis from known risks to his safety. ..................................................................37

**D.   Defendants' Should Not Be Permitted to Benefit from Facts that Defendants Prevented Plaintiff from Ascertaining Prior to a Pre-Discovery Dismissal.** .......................................................................................43

**E.   Defendants' Qualified Immunity Defenses Are Not at Issue on Appeal.** 47

**CONCLUSION**....................................................................................48

**CERTIFICATE OF COMPLIANCE** ....................................................

**CERTIFICATE OF SERVICE** ..............................................................

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Belcher v. City of Foley*, 30 F.3d 1390 (11th Cir. 1994) ........................................26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................17

*Bradford v. Dozier*, No. 5:17-cv-00321, 2017 WL 11508371 (M.D. Ga. Oct. 26, 2017) .......................................................................................................................20

*Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1236 (M.D. Ala. 2017)...............................3

*Brown v. Crawford*, 906 F. 2d 667 (11th Cir. 1990) ...............................................30

*Brown v. Sikes*, 212 F.3d 1205 (11th Cir. 2000).....................................................20

*Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251(11th Cir. 2019) .48

*Chandler v. Crosby*, 379 F.3d 1278 (2004) ...................................................... 32, 35

*Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348 (11th Cir. 2022)...........................27

*Copeland v. Ga. Dep't of Corrs.*, 97 4th 766 (11th Cir. 2024) ..............................48

*Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003)..................................................27

*Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992) ........................ 19, 20, 21

*Farmer v. Brenan*, 511 U.S. 825 (1994)........................................................... 31, 37

*Georgia Advoc. Off. V. Jackson*, No. 1:19-cv-1634-WMR-JFK, 2019 WL 12498011, at *10 (N.D. Ga. Sept. 23, 2019) .........................................................4

*Haney v. City of Cumming*, 69 F.3d 1098 (11th Cir. 1995)....................................38

*Harper v. Lawrence Cnty.*, 592 F.3d 1227 (11th Cir. 2010) ..................................38

*Hartley v. Parnell*, 193 F.3d 1263 (11th Cir. 1999) ..............................................26

*Helling v. McKinney*, 509 U.S. 25 (1993) ....................................................... 32, 37

*Hoffer v. Sec., Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020)......................38

*Hudson v. McMillian*, 503 U.S. 1, 8 (1992)..................................................... 32, 35

*Mills v. Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008) .................................17

*New v. Sports & Recreation, Inc.*, 114 F.3d 1092 (11th Cir. 1997) .......................19

*Paez v. Mulvey*, 915 F.3d 1276 (11th Cir. 2019)....................................................17

*Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).....................................................27

*Richardson v. Johnson*, 598 F.3d 734 (11th Cir. 2010).............................. 19, 20, 21

*Scott v. Miami Dade Cnty.*, No. 21-13869, 2023 WL 4196925 (11th Cir. June 27, 2023) ................................................................................. 19, 20, 21

*Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340 (11th Cir. 2022) ........................................................................................48

*Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015)... 22, 23

*Williams v. Santana*, 340 F. App'x 614 (11th Cir. 2009)........................................30

*Wilson v. Seiter*, 501 U.S. 294 (1991) .................................................................31

**Statutes**

28 U.S.C. § 1291 .................................................................................................6

28 U.S.C. § 2106 .................................................................................................6

28 U.S.C. § 2107 .................................................................................................6

42 U.S.C. § 1983 .................................................................................................6

42 U.S.C. § 1988 .................................................................................................6

O.C.G.A. § 50-18-70...........................................................................................43

O.C.G.A. § 50-18-72...........................................................................................46

**Other Authorities**

U.S. Dep't of Justice Civil Rights Div., *Investigation of Ga. Prisons*, 54-56 (Oct. 1, 2024), https://www.justice.gov/d9/2024-09/findings_report_-_investigation_of_georgia_prisons.pdf ................................................. 2, 3, 13, 35

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had original jurisdiction over Plaintiff-Appellant Christopher Dewayne Bonner's claims pursuant to 42 U.S.C. § 1983 (hereinafter, "Section 1983") and 42 U.S.C. § 1988. Upon the district court's disposition of all claims, this Court's appellate jurisdiction is derived from 28 U.S.C. §§ 1291, 2106 & 2107.

On August 16, 2024, the district court entered its Order disposing of all claims, and the Clerk of Court entered Judgment on the same day. Plaintiff-Appellant timely filed his Notice of Appeal on September 16, 2024.

## STATEMENT OF THE ISSUES

Prior to its temporary closure, the Georgia State Prison was plagued with issues, including severe understaffing, significant periods when incarcerated persons go unsupervised, and a lack of necessary mental health services. There were a significant number of incarcerated persons who lost their lives at this facility around the same time.

Within twenty days of Christopher Mathis advising Georgia Department of Corrections of specific concerns for his life, he was murdered in his sleep at the hands of his cellmate. To make matters worse, the homicide was mere days after his cellmate cut off part of another incarcerated individual's nose.

Whether John Doe defendants, specifically identified with their respective, unique positions, met the limited exception or should be dismissed *sua sponte* as improper fictitious parties?

Whether a complaint, which does not fall under any of the categories provided by case law, should be dismissed as an improper "shotgun pleading"?

Whether the Complaint adequately alleged claims against the various Defendants, based on both their specific duties and responsibilities and actual knowledge of the underlying circumstances, for violations of the Eighth Amendment?

## STATEMENT OF THE CASE

### A. Factual Background

It was the morning of Friday, February 26, 2021, at a correctional facility operated by the Georgia Department of Corrections (hereinafter, "GDC"), when Christopher Dewayne Mathis (hereinafter, "Mathis") was found dead. (Doc. 37, ¶¶ 120, 122, 127-28.)  Mr. Mathis was one of at least 87 individuals in GDC custody who was murdered in the years 2020 and 2021.  (*Id.*, ¶ 41.)[1] Fewer than twenty days before he died, Mr. Mathis warned correctional officers that he had serious concerns for his safety due to specific threats that other incarcerated individuals had made against his life. (*Id.*, ¶¶ 94-106.)

#### 1. Conditions of the Georgia State Prison

Mr. Mathis was being housed at the Georgia State Prison (hereinafter, "GSP") in Reidsville, Georgia.  (*Id.*, ¶ 24.)  GSP was[2] a 90-year-old facility that housed approximately 1,400 male inmates, and it was considered a "special mission" facility since more than 50 percent of the population suffered from

---

[1] After an investigation, the Department of Justice concluded that, "GDC inaccurately reports … deaths both internally and externally, and in a manner that underreports the extent of violence and homicide in GDC prisons." U.S. Dep't of Justice Civil Rights Div., *Investigation of Ga. Prisons*, 54-56 (Oct. 1, 2024), https://www.justice.gov/d9/2024-09/findings_report_-_investigation_of_georgia_prisons.pdf.

[2] GSP was temporarily closed by GDC in or around 2022. (Doc. 37, ¶ 138.)

mental illness or otherwise exhibited problematic behaviors. (*Id.*, ¶¶ 25-26.) Of the prison's 36 total dormitories, GDC had designated six for its "Tier II Program." (*Id.*, ¶ 27.) GDC describes its Tier II Program as "Administrative Segregation" used to house incarcerated individuals, including those who are considered a threat to the safety of the facility or have previously been leaders in a major disturbance or riot, particularly those that have resulted in an assault or homicide. (*Id.*, ¶ 29.)

All of the cells at GSP, including those used for the Tier II Program, are eight feet by ten feet and include features, such as a single, narrow window, which are specifically designed to deprive incarcerated individuals from sensory stimuli. (*Id.*, ¶¶ 33-34.) Moreover, those enrolled in the Tier II Program spend an average of 23 to 24 hours per day in their cell, including time for meals, and those incarcerated persons are only permitted to leave their cell for recreation and bathing. (*Id.*, ¶ 35-36.) These conditions are considered, generally, as "solitary confinement," regardless of whether a cell is single- or double-occupancy, and these practices are condemned by medical experts, corrections experts, and many American and international organizations due to the substantial risk of harm, deprivation of basic human needs, and propensity of causing or exacerbating physical and mental health conditions. (*Id.*, ¶¶ 50-60.)[3]

---

[3] *See also* U.S. Dep't of Justice Civil Rights Div. at 44 n. 33 (citing *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1236 (M.D. Ala. 2017); *Georgia Advoc. Off. V.*

Moreover, GSP was severely understaffed, resulting in a variety of very real consequences for its population.  Specifically, around the time at issue, GSP had a 70% officer vacancy rate, one of the highest of all of GDC's facilities, and less than half of the number of officers that GDC determined were needed to operate the facility.  (*Id.*, ¶ 38.)  As a result of this understaffing, those enrolled in Tier II are often not given the opportunity to have the required amount of time recreating or bathing in a given week. (*Id.*, ¶ 37.) Frequently, incarcerated individuals do not see a single officer in their dormitory overnight or on the weekends. (*Id.*, ¶ 39.) Officers generally fail to perform rounds in each dorm every fifteen or 30 minutes, as required by GDC policy. (*Id.*, ¶ 40.)

GDC also failed to provide individuals incarcerated at GSP with necessary mental health services.  In 2019, around 73% of those enrolled in the Tier II Program were designated as "Mental Health Level II" patients, meaning that they suffered from mental illness or had expressed suicidal ideation, engaged in self-injurious behavior, or required placement in a crisis unit.  (*Id.*, ¶ 61.)  Indeed, GDC's policies require all incarcerated individuals to receive necessary mental health services.  (*Id.*, ¶ 62.)  However, individuals in the Tier II Program often do not receive these services, they are not provided opportunities to see a mental health professional, they may not be administered medication they have been

---

*Jackson*, No. 1:19-cv-1634-WMR-JFK, 2019 WL 12498011, at *10 (N.D. Ga. Sept. 23, 2019) (internal citations omitted)).

prescribed for mental health conditions, and in addition to having half of the mental health counselors than it should, the counselors who are working at GSP rarely interact with incarcerated individuals. (*Id.*, ¶¶ 63-67.) GSP's "Acute Care Unit," which is specifically designated for individuals in need of psychiatric care, is often left entirely unsupervised for extended periods of time, and these inmates are not provided with a mattress, sheets, or blankets for the metal bunks. (*Id.*, ¶¶ 68-69.)

There were several other deaths at GSP around the time that Mr. Mathis was killed. One man suffocated and died in April 2020 after he was assaulted by another incarcerated individual, and GSP staff later found his remains covered in blood. (*Id.*, ¶ 43.) In September 2020, GSP staff discovered one man's body at least one day after he apparently perished. (*Id.*, ¶ 44.) The second death at GSP in November 2020 occurred when a Tier II participant did not receive medical attention that he had been requesting from the staff for around one week. (*Id.*, ¶¶ 45-46.) In December 2020 and September 2021, three individuals lost their lives after stabbing incidents. (*Id.*, ¶¶ 47, 49.) In May 2021, an officer refused to enter a cell that he saw was flooding because the officer was singerly responsible for patrolling two different buildings, and the body of the individual housed therein was later found covered in cuts and gashes, and another person died after an officer failed to respond to an apparent fire; both occurred the same month in a Tier II

Program dormitory. (*Id.*, ¶ 48.) Moreover, between September 2019 and May 2021, at least twelve other individuals incarcerated at GSP lost their lives due to suicide. (*Id.*, ¶ 57.)

### 2. Parties

The Commissioner of GDC is responsible for managing all of GDC's facilities, including GSP, all of GDC's subdivisions, and all of GDC's employees. (*Id.*, ¶ 6.) At all times relevant to this action, Defendant Timothy Ward (hereinafter, "Commissioner Ward") held this position. (*Id.*) Defendant Ahmed Holt (hereinafter, "Assistant Commissioner Holt") served as GDC's Assistant Commissioner over facilities, and he was responsible for overseeing all of GDC's facilities and monitoring the supervision and safety of all felony offenders in GDC's custody. (*Id.*, ¶ 7.) GDC's Statewide Mental Health Director is responsible for planning and assisting in the implementation of mental health related policies and procedures and for the coordination of mental health services at all GDC facilities, and Defendant Javel Jackson, Psy.D (hereinafter, "Director Jackson") served in the role during the relevant time. (*Id.*, ¶ 8.) Commissioner Ward, Assistant Commissioner Holt, and Director Jackson were specifically responsible for approving the conditions of GSP's solitary confinement units. (*Id.*, ¶ 70.)

The Warden of GSP oversees and supervises all staff, inmates, and pretrial detainees housed at GSP, and Defendant Trevonza Bobbitt (hereinafter, "Warden

Bobbitt") was in this position during the relevant time. (*Id.*, ¶ 9.) GSP's Deputy Warden over facilities, GSP's Deputy Warden over living conditions, and GSP's Mental Health Unit Manager were responsible for overseeing the security, living conditions, and the daily operation of mental health services, respectively, at GSP. (*Id.*, ¶ 10.) While these are all real persons who were serving in specific positions, their names are not known to Plaintiff, and they were designated as Defendants John and Jane Doe in this action as a result. (*Id.*, ¶¶ 18-22.) Defendant Marjorie Glover served as a supervisory correctional officer with the rank of Captain (hereinafter, "Captain Glover"). (*Id.*, ¶¶ 11.) In that role, Captain Glover was responsible for overseeing all subordinate personnel and incarcerated individuals at GSP. (*Id.*)

Commissioner Ward, Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, Defendants John and Jane Doe, and Captain Glover were all aware of the conditions of the units at GSP, as well as the harms caused by such conditions on incarcerated individuals. (*Id.*, ¶ 72.) Moreover, solitary confinement has been condemned by organizations like the Association of State Correctional Administrators, an organization for which Commissioner Ward belonged. (*Id.*, ¶ 53.) Additionally, GDC contracted a forensic psychiatrist to provide annual audits concerning GDC's provision of mental health services, and the psychiatrist sent a letter to Commissioner Ward in April 2019, specifically advising him that GDC's

Tier programs were inconsistent with GDC's Standard Operating Procedures. (*Id.*, ¶ 76-78.) These were similar concerns raised by GDC's Office of Professional Standards in an audit performed in 2018, a report issued in November 2019, and a September 2018 Annual Assessment, as well as a report issued by GDC's Office of Health Services around the same time. (*Id.*, ¶¶ 77, 79-80.) The Office of Professional Standards issued its 2019-2020 Audit Report, addressing the same directly to Warden Bobbitt and GSP's Mental Health Unit Manager, advising that staffing shortages were limiting the provision of effective mental health services at GSP. (*Id.*, ¶ 81.) GDC had also recently been advised of constitutional and civil rights violations in its Tier II units and its facilities generally and at GSP, including by the Southern Center for Human Rights, numerous civil actions filed by or on behalf of incarcerated persons, media outlets, and the Department of Justice, as described herein. (*Id.*, ¶¶ 82-85.)

The remaining Defendants are all correctional officers who were assigned to GSP, and who were responsible for overseeing inmates in the custody of GSP, including the provision of emergency medical care. (*Id.*, ¶¶ 12-17.) As with their supervisors, these remaining Defendants had actual knowledge of the conditions and resultant harm for which incarcerated persons are subjected in GSP's solitary confinement units. (*Id.*, ¶ 74.)

3.  <u>The confinement and death of Christopher Dewayne Mathis</u>

Mr. Mathis was convicted of robbery by force, resulting in a 20-year sentence, and he began his detention with GDC in Spring 2011. (*Id.*, ¶¶ 87-89.) In or before 2019, Mr. Mathis was transferred from another GDC facility into the custody of GSP. (*Id.*, ¶ 90.) Mr. Mathis had several subsequent encounters with GSP staff in which the staff reported concerns for Mr. Mathis' mental health and reported the same to Warden Bobbitt. (*Id.*, ¶ 91.) On one occasion in September 2020, Mr. Mathis sustained multiple puncture wounds, but declined to provide a statement to GSP staff. (*Id.*, ¶ 92.) As a result, GSP staff assigned Mr. Mathis to a Tier II dorm, but GDC did not investigate the incident further, and Warden Bobbitt did not review the incident report until nearly two months later. (*Id.*) However, even if Warden Bobbitt had reviewed the report sooner, it erroneously indicated that Mr. Mathis did not sustain injuries as a result of the September 2020 incident. (*Id.*, ¶ 93.)

On February 6, 2021, Captain Glover was escorting another incarcerated person to the dormitory where Mr. Mathis was assigned, when Captain Glover observed Mr. Mathis attempting to leave the dormitory and refused Captain Glover's directive to return. (*Id.*, ¶¶ 94-96.) Three other correctional officers responded to Captain Glover's call for backup, and all four individuals tried to restrain Mr. Mathis. (*Id.*, ¶¶ 97-99.)

Critically, when Mr. Mathis calmed down, he explained that he was trying to

leave his assigned dormitory because Mr. Mathis had learned that other individuals in GSP custody had made threats to Mr. Mathis' life. (*Id.*, ¶ 100.)  These officers were aware that Mr. Mathis had apparently been stabbed by an inmate merely four months earlier. (*Id.*, ¶ 102.)  Mr. Mathis had expressed similar concerns in his recent communications with members of his family. (*Id.*, ¶ 103.)  Specifically, Mr. Mathis told his family that a relative of the victim of the crime for which Mathis was convicted was employed in the food services department of GSP, and that this GDC employee had been attempting to pay an incarcerated individual to kill Mr. Mathis. (*Id.*, ¶¶ 103-04.)  Mr. Mathis told his own relatives that he had made several attempts to transfer to another unit due to the threats against his life, but that his requests had been ignored. (*Id.*, ¶ 105.)

After Mr. Mathis disclosed the same to Captain Glover and the three other officers on February 6, 2021, the staff escorted Mr. Mathis to the Acute Care Unit for the purposes of receiving mental health treatment. (*Id.*, ¶¶ 106-07.)  According to GDC policies, Warden Bobbitt, Director Jackson, Assistant Commissioner Holt all had to review the recommendation and approve Mr. Mathis' transfer to the Acute Care Unit. (*Id.*, ¶¶ 108-10.)  In the event that the transfer were denied, GDC policies would have required Assistant Commissioner Holt to provide written justifications for the denial. (*Id.*, ¶ 111.)

Similarly, GDC policies required Mr. Mathis to be placed in a single

occupancy cell, unless there was a written justification for assigning Mr. Mathis to a double-bunk cell with a cellmate. (*Id.*, ¶ 112.)  Still, Mr. Mathis was placed in a cell with a double-bunk and cellmate, even though no written justification for this assignment was ever made. (*Id.*, ¶ 113.)  Warden Bobbitt reviewed Captain Glover's report, which noted Mr. Mathis' concerns for his own safety due to the threats he had learned. (*Id.*, ¶ 114.)  However, Mr. Mathis' request to be transferred to another facility were still ignored. (*Id.*, ¶ 115.)  Instead, Mr. Mathis was assigned to a cell in a dormitory designated for the Tier II Program. (*Id.*, ¶ 116.)  Mr. Mathis was assigned to share a room with Semaj Lyquell Johnson (hereinafter, "Johnson"), an individual with several violent felony convictions, including a fifteen-year sentence for aggravated assault.  (*Id.*, ¶ 117.) For the reasons described further herein, Defendants knew, at the time of this assignment, that Mr. Johnson was a particular threat to other incarcerated persons.

From 6:00 pm on February 25, 2021, and in the twelve hours that followed, there were no correctional officers present in the dormitory where Mr. Mathis and Mr. Johnson were being housed. (*Id.*, ¶¶ 120-21.)  It was during that period in which Mr. Johnson was seen violently attacking Mr. Mathis, banging Mr. Mathis' head repeatedly against a dull, flat surface, resulting in blunt force trauma to Mr. Mathis' skull.  (*Id.*, ¶¶ 120-24.)  Other incarcerated persons somehow captured this incident on video using mobile devices smuggled into the facility, which would

later be posted on social media. (*Id.*) Yet, GDC's report indicates that the incident was not captured on the facility's video surveillance. (*Id.*, ¶ 125.) As a result, it is unclear at this time whether Mr. Mathis was also raped and stabbed, or whether a second attacker had been able to enter Mr. Mathis' cell, as some witnesses reported. (*Id.*, ¶ 126.)

No GDC employees responded immediately after the attack, and it was not until 7:30 am when three correctional officers reported to Mr. Mathis cell, pronouncing him dead at 7:50 am on February 26, 2021. (*Id.*, ¶¶ 127-28.) Not only did these three officers disturb the scene prior to receiving authorization from the Warden to do so, the Warden also allowed the officers to leave the facility before they submitted their written statements about the incident, all in violation of GDC's Standard Operating Procedures. (*Id.*, ¶¶ 129-30.)

Moreover, one of the other individuals housed in Mr. Mathis' dorm observed one of the responding officers using his foot to kick Mr. Mathis, or his remains, in the head. (*Id.*, ¶ 131.) And that incarcerated individual was able to capture the officer kicking Mr. Mathis on video. (*Id.*) The funeral home ultimately had to place a hat on Mr. Mathis' head and secure parts of his skull together using a wire due to the severity of Mr. Mathis' injuries. (*Id.*, ¶ 133.)

GDC failed to capture Mr. Mathis' attack on video. (*Id.*, ¶¶ 134-36.) GDC did not issue one of its standard press releases about the death of Mr. Mathis. (*Id.*)

It does not even appear that GDC investigated Mr. Mathis' death further. (*Id.*) Indeed, Mr. Johnson was subsequently charged with felony murder, malice murder, aggravated assault, and unlawful acts of violence in a penal institution as a result of Mr. Mathis' death. (*Id.*, ¶ 137.)

The United States Department of Justice (hereinafter, "DOJ") subsequently issued its Investigation of Georgia Prisons.[4]  According to that report, in pertinent part:

> [DOJ] concludes that there is reasonable cause to believe that the State of Georgia and [GDC] violate the Eighth Amendment of the United States Constitution … The State is deliberately indifferent to these unsafe conditions.  The constitutional violations are exacerbated by serious deficiencies in staffing and supervision, physical condition and security of the facilities, classification and housing, management of gangs and other security threat groups, control of weapons and other contraband, and incident reporting, response, and investigation. The State has known about the unsafe conditions for years and has failed to take reasonable measures to address them.

U.S. Dep't of Justice Civil Rights Div., *supra* at 3.  DOJ issued this report on October 1, 2024, just over one month after the district court dismissed all of Plaintiff's claims.

## B. Procedural Background

Plaintiff-Appellant Christopher Dewayne Bonner (hereinafter, "Plaintiff") is

---

[4] (*See* Doc. 37, ¶ 85 ("As a result of many of the incidents described herein, [DOJ] announced in September 2021 that it was opening a civil rights investigation into GDC's facilities, with a specific focus on the harms that inmates face from other prisoners.").)

the only son of the late Mr. Mathis (Doc. 37, ¶ 5), and he initiated this action on February 24, 2023. (*See generally* Doc. 1.)   The initial pleading alleges that Defendants subjected Mr. Mathis to cruel and unusual punishment as a result of the conditions of GSP, that several supervisory-Defendants were deliberately indifferent to the safety of Mr. Mathis due to their failure to hire and maintain adequate levels of staffing at GSP, and that Defendants failed to protect Mr. Mathis from a substantial risk of harm that Mr. Mathis faced from another incarcerated person. (*Id.*, ¶¶ 142-53, 155-63, 165-78.)

Prior to filing suit, Plaintiff provided the Georgia Department of Administrative Services and GDC with notice of his claims. (*See* Doc. 37, ¶ 140.) Additionally, Plaintiff made several requests under the Georgia Open Records Act for documents pertaining to Mr. Mathis and the circumstances surrounding his death, but GDC expressly refused to provide many categories of documents, preventing Plaintiff from ascertaining all of the facts, including the identities of Defendants John and Jane Doe. (*Id.*, ¶¶ 19-22.)

Defendants filed their respective Motions to Dismiss on June 20, 2023. (Doc. 25; Doc. 27.)   Therein, Defendants argued that the initial Complaint should be dismissed as an impermissible "shotgun pleading" because it contained multiple counts where each count adopts the allegations in proceeding counts, and because Defendants were purportedly unclear as to which allegations pertained to each

Defendant. (*See* Doc. 25-1 at 5-8; Doc. 27 at 10-12.) Director Jackson specifically argued that the initial pleading contained conclusory, vague, and immaterial facts. (Doc. 27 at 10-12.) Defendants further contended that the claims should be dismissed for failure to state a claim and because Defendants were entitled to qualified immunity. (Doc. 25-1 at 8-19; Doc. 27 at 5-10.)

After the first Rule 12 Motions were fully briefed, the district court entered its Order, granting Defendants' Motions to the extent that the district court construed said Motions as seeking more definite statement and directing Plaintiff to amend his pleading. (*See generally* Doc. 36.) While the district took issue with portions of the initial pleading, it found that it did not overtly violate the rule against alleging multiple counts that adopt the allegations of all proceeding counts. (*Id.* at 7-8.) However, the district court also concluded that the pleading asserted multiple claims against multiple Defendants, but did not specify which individuals were responsible for certain acts. (*Id.* at 5-6.) As a result, the district court instructed Plaintiff to amend his pleading within fourteen days. (*Id.* at 9.)

Plaintiff complied with the district court's directive by filing his First Amended Complaint (hereinafter, "Complaint") on February 8, 2024. (*See generally* Doc. 37.) In so doing, Plaintiff provided specific citations within the legal counts citing back to the Complaint's Statement of Facts in an effort to clarify which facts, including the conduct of Defendants that formed the basis of

each claim. (*See, e.g.*, Doc. 37, ¶ 144 (citing other portions of the Complaint and addressing each Defendant's responsibilities over the facility).)   After Plaintiff amended his Complaint, Defendants filed their second set of nearly-identical Rule 12 Motions to Dismiss. (*See generally* Doc. 39, Doc. 40.)

The parties briefed the respective Rule 12 Motions, and on August 16, 2024, the district court entered its Order.  (*See generally* Doc. 51.)  The district court first found that the Complaint was an impermissible shotgun pleading, dismissing several claims against several of the Defendants. (*Id.* at 9-15.)  The district court also determined that Plaintiff's description of the two GSP Deputy Wardens over GSP's security and living conditions and GSP's Mental Health Unit Manager were an impermissible attempt at fictious-party pleading, and the district court dismissed Defendants John and Jane Doe as a result.  (*Id.* at 15-17.)  As for the remaining claims and Defendants, the district court found that Plaintiff failed to state those claims, and dismissed them as a result. (*Id.* at 17-41.)  The district court did not address each Defendants' qualified immunity defense.  (*See generally* Doc. 51.)

Judgment was also entered on August 16, 2024.  (*See generally* Doc. 52.)  On September 16, 2024, Plaintiff filed his Notice of Appeal (*see generally* Doc. 53), and this appeal ensued.

### C. Standard of Review

The Court reviews the district court's ruling on a motion to dismiss *de novo*.

16

*Paez v. Mulvey*, 915 F.3d 1276, 1292 (11th Cir. 2019). In so doing, the Court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008) (citations and punctuation omitted.)  A motion to dismiss should be denied if, taking the allegations in the plaintiff's complaint as true, the plaintiff makes out a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## <u>SUMMARY OF THE ARGUMENT</u>

The district court erred in dismissing fictious parties *sua sponte* because they were described in the Complaint by their specific and unique positions, and should have met the limited exception to this prohibition under this Court's precedent. The district court further abused its discretion in finding that the Complaint constituted a "shotgun pleading" when the Complaint did not fall into any of the categories of the same under the applicable authorities.  The Complaint plausibly alleged violations of the Eighth Amendment, and it was therefore erroneous for the district court to dismiss the same.

17

## ARGUMENT

### A.     The John and Jane Doe Defendants Met the Limited Exception for Fictious Pleading and Should Not Have Been Dismissed.

The district court erred in dismissing the "John" and "Jane Doe" Defendants *sua sponte* because they were identified specifically by their respective, unique positions and their identities would have been easily ascertained in discovery, meeting the limited exception to permissible fictitious party pleading. According to the Complaint, the John and Jane Doe Defendants were comprised of three specific individuals, the Deputy Wardens of the GSP facility who oversaw security and living conditions, respectively, and the Mental Health Unit Manager of GSP. (Doc. 37, ¶ 10.)  As alleged, these individuals were indeed real persons, but their names were unknown because they could not be identified by Mr. Mathis due to his demise and because GDC had refused to produce documents requested at that time. (*Id.*, ¶¶ 18-19, 22.)  Under GDC's policies, the unnamed Deputy Wardens were responsible for implementing GDC's policies concerning solitary confinement units, they were familiar with the conditions of GSP, and they were specifically responsible for approving the housing assignment of Mr. Mathis and his attacker. (*Id.*, ¶¶ 71-72, 74, 116, 118.)  The district court found that these were bare descriptions and conclusory allegations that did not lead to the real possibility that the individuals' identities would be revealed in discovery, further likening these

allegations to another case that merely named fictious-defendants as "guards at the correctional institute."  (Doc. 51 at 15-17 (citation omitted).)

The John and Jane Doe Defendants should not have been dismissed because they clearly met the limited exception to the prohibition on fictious party pleading. Indeed, "[a]s a general matter, fictious-party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (citing *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n. 1 (11th Cir. 1997)). The limited exception to this rule is "when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'" *Id.* (quoting *Dean v. Barber*, 951 F.2d 1210 (11th Cir. 1992)).  In *Richardson*, the plaintiff merely identified the defendant as "John Doe (Unknown Legal Name), Guard. Charlotte Correctional Institute."  *Id.* While the plaintiff appeared to ultimately obtain, at least, the last name of the defendant (i.e., "a Mr. Mitchell"), that was only after the fictious party had already been dismissed. *Id.*  As a result, this Court found that the dismissal was proper. *Id.*

This Court recently provided further explanation concerning the nuance of the exception to fictious-party pleading. *See Scott v. Miami Dade Cnty.*, No. 21-13869, 2023 WL 4196925 (11th Cir. June 27, 2023).  With specific regard to prisoner lawsuits, in which the plaintiffs encounter difficulties identifying the precise defendants, it may be more appropriate for a district court to order the

disclosure of the fictitious-defendants' identity or permit some discovery to adduce the same, instead of dismissing the fictious party claims. *Id.*, 2023 WL 4196925, at *7 (citing *Brown v. Sikes*, 212 F.3d 1205, 1209 n. 4 (11th Cir. 2000)). Indeed, the proposed defendant must actually exist, the description must be sufficient to allow for service of process, and the identification must be more specific than a title. *Id.* (citing *Richardson*, 598 F.3d at 738; *Dean*, 951 F.2d at 1215 n.6). However, critically, "naming a defendant with a unique title, such as 'Chief Deputy of the Jefferson County Jail John Doe' and 'Governor of Alabama,' has been treated as sufficient." *Id.* (citing *Dean* at 1215-16 & n.6); *see also Bradford v. Dozier*, No. 5:17-cv-00321, 2017 WL 11508371, at *7 (M.D. Ga. Oct. 26, 2017) (declining to dismiss and allowing claim, naming the counselor and the program unit manager assigned to a prison's classification committee as "Doe" defendants, to proceed to discovery). In *Scott*, the plaintiff merely identified the fictious party as "[o]fficer," and because the district court had given the plaintiff multiple opportunities to identify said individual, before ultimately dismissing the same after the plaintiff was unable to ascertain the name, the district court did not abuse its discretion. *Id.*

Here, the district court did not address the fictitious-party pleading in its Order on Defendants' first Motions to Dismiss. (*See generally* Doc. 36.) And unlike in *Scott*, the district court did not give Plaintiff any opportunity to discover

the name of the John and Jane Doe Defendants. *Cf. Scott*, 2023 WL 4196925, at

*7. As though Plaintiff had identified the governor of a specific state, the person in

charge of a county jail, or individuals holding specified positions that were

assigned to a specific prison committee, the Plaintiff here identified three specific

people as the John and Jane Doe Defendants – the individuals who served as *the*

facility's Mental Health Unit Director, *the* prison's Deputy Warden over security,

and *the* Deputy Warden who managed the facility's living conditions – all of

whom actually exist, and could have been identified for service had Plaintiff been

permitted very limited discovery, or had the district court ordered Defendants to

identify and disclose the same. *See Dean*, 951 F.2d at 1216 n. 6. As a result,

Plaintiff did not name fictious parties, Plaintiff named real individuals whose John

and Jane Doe designations were merely surplusage. *See Richardson*, 598 F.3d at

738. The district court erred in dismissing Defendants John and Jane Does *sua*

*sponte*. *See Dean*, 951 F.2d at 1216.

### B.    The District Court Abused Its Discretion in Finding that the Complaint Was a "Shotgun Pleading."

The district court's determination that the Complaint constituted a "shotgun

pleading" was erroneous, and it was therefore an abuse of discretion to dismiss

certain claims. The Complaint did not fall under any of the four categories of

shotgun pleading that have been regularly defined by this Court. Those four

categories include complaints that: 1) contain "multiple counts where each count

adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; 2) "is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; 3) "commits the sin of not separating into a different count each cause of action or claim for relief"; and, 4) violates "the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is being brought against." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) (citations omitted). The district court incorrectly determined that the Complaint violated the fourth category and effectively, while not technically, violated also violated the first.

> 1. <u>None of the counts adopt the allegations of any other count.</u>

On one hand, the district court correctly determined that the "first sin was not overly violated…" (*See* Doc. 51 at 9; *see also* Doc. 26 at 7-8 (the original pleading "treads close to a violation of the first sin" in that each of the counts incorporated the factual allegations contained in the statement of facts).) Conversely, the district court was not correct that the "[Complaint] yielded an identical result by incorporating all claims, most of which were immaterial to the claims." (*Id.*)

The Complaint included sections entitled "Jurisdiction and Venue," "Parties," and "Statement of Facts." (Doc. 37, ¶¶ 1-140.)  Indeed, each of the legal counts incorporated those sections. (*Id.*, ¶¶ 141, 154, 164.)  However, each legal count restated or summarized the factual allegations that formed the basis of each claim.  (*See id.*, ¶¶ 141-178.)  Moreover, the allegations contained in each legal count in which additional explanation may have been helpful included specific reference to those paragraphs in which that detail could be found. (*See id.*, ¶¶ 142-44, 149, 152, 158, 161-62, 168-70, 173-76.)  At no point does the Complaint contain "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *See Weiland*, 792 F.3d at 1321.

2.  <u>The Complaint clearly indicates against which Defendants the claims are brought, and the specific acts and omissions leading to each Defendants' liability.</u>

The Complaint did not commit the "relatively rare sin of asserting claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *See id.*, 792 at 1322.  In the original pleading, Plaintiff specified in the header of each count which of the Defendants he alleged were liable for the specific cause of action (*See* Doc. 1 at 32, 34, 37), and the same was true in the amended Complaint. (*See* Doc. 37 at 32, 35, 37.)

Plaintiff also established the duties and authority that each of the Defendants had as a result of their specific position. (*See, e.g.*, *id.*, ¶¶ 143-44.) The amended Complaint ties those allegations back specifically to the factual allegations pertaining to the specific Defendants. (*See, e.g.*, *id.*, ¶¶ 143 (citing Doc. 37, ¶¶ 70 (discussing the role in which Commissioner Ward, Assistant Commissioner Holt, and Director Jackson played in designing or approving the solitary confinement conditions of GSP), 71 (discussing how GDC's policies concerning solitary confinement are implemented by or under the direction of Warden Bobbitt, Defendants John and Jane Doe, and Captain Glover), 72 (explaining why Commissioner Ward, Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, Defendants John and Jane Doe, and Captain Glover are subjectively aware of the conditions of solitary confinement at GSP due to their roles and responsibilities)); *see, e.g.*, *id.*, ¶¶ 144 (citing Doc. 37, ¶¶ 9-17 (alleging the roles and responsibilities of each Defendant employed at GSP on issues relevant to this suit), 71-73 (alleging that the conditions of confinement, and the resultant harms, should have been apparent to anyone who observed them, including the Defendants named therein who had indeed observed the conditions), 74 (alleging that Warden Bobbitt, Defendants John and Jane Doe, Captain Glover, and Defendants Hall, Milliken, Williams, Reginald Jackson, Klingman, and Mendez are aware of the conditions of solitary confinement and the resultant harms because

they have been observed by nature of their work assignments and roles).)

Similarly, the First Amended Complaint goes further to show what actions and inactions each Defendant took that led to the violation at issue in this action, and specifically cites to the paragraphs alleging what each Defendant did or failed to do. (*See, e.g.*, *id.*, ¶¶ 149-52 (citing Doc. 37, ¶¶ 25-86, 71-74, 111-28 (describing each of the Defendants' actions and inactions with specific regard to Mr. Mathis and the events relevant to this litigation).) The examples cited herein should have been sufficient for Defendants to ascertain which of each of the Defendants' acts and omissions led to their liability on Count I for cruel and unusual punishment in violation of the Eighth Amendment based on the conditions of confinement for which Mr. Mathis was subjected. Quite simply, the district court erred in finding that the Complaint asserts multiple claims against multiple Defendants, without specifying which of the Defendants were responsible for which acts. Accordingly, this Court should find that the district court erred in finding that the Complaint constituted any recognized type of shotgun pleading, and that the district court abused its discretion in dismissing those claims.

**C.    Plaintiff's Allegations Concerning the Defendants Failure to Hire, the Conditions of Confinement, and the Failure to Protect Were Sufficient and Should Have Survived a Rule 12 Motion.**

1.  The conditions of Mathis' confinement were created, in part, by the supervisory-Defendants' failure to provide adequate levels of staffing and supervision at GSP.

Plaintiff established valid claims that Commissioner Ward and Warden Bobbitt were deliberately indifferent to the safety of Mr. Mathis as a direct result of said Defendants' failure to hire and maintain adequate levels of staffing at GSP.[5] Commissioner Ward and Warden Bobbitt had specific responsibility to ensure that GSP had a sufficient amount of staff and supervision of its population, and they were both aware of significant problems arising from these staffing deficiencies, but failed to correct the staffing issues, resulting in the death of Mr. Mathis.

As a general matter, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)). "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.

---

[5] Plaintiff's claim for failure to hire was also asserted against Assistant Commissioner Holt and Director Jackson. (Doc. 37, ¶¶ 154-63.)   However, the district court dismissed this claim as to those Defendants after erroneously concluding that the claim, as it pertained to said Defendants, was a shotgun pleading, as discussed above. (*See* Doc. 51 at 13-14.)   As with Defendants' qualified immunity defense, which the district court also did not consider, as discussed below, this Court should reinstate this claim as to said Defendants, but decline to consider whether Plaintiff failed to state a claim as to Assistant Commissioner Holt and Director Jackson since the issue was not considered below.

2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *see also Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1355 (11th Cir. 2022).  "The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Christmas*, 51 F.4th at 1355 (quoting *Cottone*, 326 F.3d at 1360). Alternatively, a plaintiff establishes such causal connection when the supervisor's custom or policy results in deliberate indifference to constitutional rights or when the facts support an inference that the supervisor directed their subordinates to act unlawfully or knew that the subordinate would act unlawfully but failed to prevent them from doing so.  *Id.*

Plaintiff adequately alleged that Commissioner Ward and Warden Bobbitt were deliberately indifferent to maintaining proper levels of staffing and supervision, through their failure to hire, at GSP.  Commissioner Ward and Warden Bobbitt were both responsible for overseeing and supervising the employees assigned to work at GSP (Doc. 37, ¶¶ 6, 9), which would necessarily include the hiring of employees and the assignment of employees' shifts.  Around the time of Mr. Mathis' murder, GSP had less than half the number of officers that the facility needed to operate, and its vacancy rate was around 70% at the time. (*Id.*, ¶ 38.) Because of these deficient levels of staffing, correctional officers often went unseen on nights and weekends, and the requisite rounds in 15- or 30-minute

intervals often only happened once every five or six hours.  (*Id.*, ¶¶ 39-40.)  GSP did not have enough staff to provide incarcerated individuals with the time required weekly for incarcerated persons to recreate or bathe as required under the policies.  (*Id.*, ¶ 37.) Not only were there a deficient level of correctional officers, GSP also failed to have sufficient mental health professionals needed to provide incarcerated individuals with the mental health treatment they required.  (*Id.*, ¶¶ 62-69.)   In fact, half of GSP's mental health counselor positions were also unfilled around this time.  (*Id.*, ¶ 66.)

But this was not just about the cleanliness, levels of physical activity, or the mental health check-ins that incarcerated individuals received;  Commissioner Ward and Warden Bobbitt were aware of numerous examples of life-threatening consequences that were a direct result of the deficient levels of staffing and supervision by both guards and mental health professionals.  As a general matter, both men were aware that there had been 87 homicides in GDC facilities statewide in 2020 and 2021.  (*Id.*, ¶ 41.) Of course, some of deaths at GSP around this time may have been prevented had there been adequate levels of staffing and supervision. (*See id.*, ¶¶ 43, 45, 47, 49.) This includes at least twelve individuals housed as GSP who lost their lives due to suicide from September 2019 through May 2021.  (*Id.*, ¶ 57.)  However, some of these deaths were clearly the direct result of the inability for staff to respond to emergency situations, medical or

otherwise. GSP personnel did not find the body of one man likely until the day after he died when GSP staff tried to escort individuals to the showers. (*Id.*, ¶ 44.) Two months later, another man apparently died after he had been requesting medical attention that he did not receive for around one week. (*Id.*, ¶ 46.) Another man died shortly after Mr. Mathis when a correctional officer observed smoke or an apparent fire, but failed to refused to respond. (*Id.*, ¶ 48.) And in the same month, an incarcerated individual died after a correctional officer knew that a pipe had burst in the man's cell, but the guard refused to enter the dormitory because he was singerly responsible for securing two whole buildings the entire shift. (*Id.*)

In addition to being aware of the aforementioned circumstances, including through their personal observation (*see id.*, ¶¶ 72-73), Commissioner Ward and Warden Bobbitt were specifically put on notice of their need to correct the problems at GSP with the low staffing levels and lack of supervision. In a 2019 report, a forensic physiatrist engaged by GDC specifically warned that GDC's failure to abide by its own policies, including to the failure to provide recreation or necessary mental health services – both the result of lack of staffing – was causing significant concern for the facilities. (*Id.*, ¶¶ 75-78.) On at least two occasions in 2018, GDC's Office of Professional Standards raised specific concerns for mental health services at GSP, including the inability of mental health counselors to do status checks and guards not making the requisite rounds. (*Id.*, ¶¶ 79-80.) Warden

Bobbitt got a specific warning from the Office of Professional Standards concerning staffing shortages sometime in or around 2020. (*Id.*, ¶ 81.) If all of this were not enough, Commissioner Ward and Warden Bobbitt should have been aware of similar concerns about GSP being raised by the Southern Center for Human Rights in several letters it prepared in 2020, civil actions alleging constitutional and other civil rights violations, media articles, and the investigation by DOJ discussed herein. (*Id.*, ¶¶ 82-85.)

There should have been no question that the problems with staffing and lack of supervision of incarcerated individuals was widespread from several years prior to Mr. Mathis' death until GSP was temporarily closed. "The depravations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Williams v. Santana*, 340 F. App'x 614, 617 (11th Cir. 2009) (quoting *Brown v. Crawford*, 906 F. 2d 667, 671 (11th Cir. 1990)). The district court erred in analyzing this factor because it focused on *some* of the consequences of the lack of staffing and supervision, instead of the staffing and supervision problem itself. (*See* Doc. 51 at 35.) Indeed, some of the deaths alleged in the Complaint may or may not have been a direct result of lack of staffing or supervision – however, some of the deaths certainly were, but that still does not change the fact that GSP had serious problems with staffing levels and lack of

supervision. The deprivations caused by staffing levels and lack of supervision were obvious, flagrant, rampant, and of continued duration to the extent that Commissioner Ward and Warden Bobbitt were clearly on notice of the problem, and it was therefore erroneous to dismiss this claim against those supervisory-Defendants.

2. <u>The conditions of Mathis' confinement were a risk to his personal safety, and he was therefore subject to cruel and unusual punishment.</u>

While the district court appeared to understand the claim (*see* Doc. 51 at 17), it should have found that, under the totality of the circumstances, the conditions for which Mr. Mathis was subjected at GSP deprived him of his personal safety. Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement, including to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must '*take reasonable measures to guarantee the safety of inmates.*'" *Farmer v. Brenan*, 511 U.S. 825, 832 (1994) (citations omitted) (emphasis added). "*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise…" *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Here, Plaintiff alleges that the totality of the conditions at GSP created a situation in which Mr. Mathis'

31

personal safety was at risk. (*See* Doc. 51 at 19 ("According to Plaintiff, the conditions at GSP, especially in Tier II dormitories aggravated or worsened adverse mental health outcomes for prisoners, creating a substantial risk for serious harm, which created the conditions possible for a third-party to kill Mr. Mathis."); *see also* Doc. 37, ¶¶ 141-153.)

The district court should have found that this claim met both parts of the two-part analysis. *See Chandler v. Crosby*, 379 F.3d 1278, 1289 (2004). First, for the objective component, an incarcerated individual "must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1 (1992)). "The challenged condition must be 'extreme.'" *Id.* (quoting *Hudson*, 503 at 9). Indeed, the incarcerated individual need not await a tragic event to occur before seeking relief, so long as he is able to show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety." *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993)). Analyzing this factor requires more than a scientific and statistical inquiry of the harms, but also for a court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk…" *Id.* (quoting *Helling*, 509 U.S. at 36).

While the district court considered many of these conditions in isolation, its

ultimate conclusion that Plaintiff's allegations met the objective prong of this analysis was correct. (*See* Doc. 51 at 21-26.) As a "special mission" facility, the specific purpose of GSP was to house individuals with mental illness or who had otherwise exhibited problematic behaviors. (Doc. 37, ¶ 26.) Around the time of Mr. Mathis' death, GDC had identified more than half of the people housed at GSP to have mental illness. (*Id.*) All individuals incarcerated at GSP are assigned to very small cells, which were specifically designed to limit sensory stimuli and movement. (*Id.*, ¶¶ 33-34.) Those, like Mr. Mathis, in Tier II cells, are only supposed to be let out of their cells for less than an hour, on average per day, for recreation and bathing, but many times residents are not permitted time for recreation or showers, and these are conditions that may be considered a type of "solitary confinement." (*Id.*, ¶¶ 35-37, 50-56.) It is also important to note that inmates at GSP are exposed to significant levels of violence and death all around them. (*Id.*, ¶¶ 41-49, 57.) To make matters worse, GDC fails to investigate some apparent assaults, including the September 2020 incident in which Mr. Mathis had clearly been stabbed. (*Id.*, ¶¶ 92-93.) When an incarcerated person is in serious and urgent need of mental health treatment, they are moved to the "Acute Care Unit," but not even given mattresses, sheets, or blankets to use on their metal bunks. (*Id.*, ¶¶ 68-69.)

But, even the individuals who have been identified by GDC as needing

mental health treatment don't receive the same. GDC is aware that the conditions for which it subjected incarcerated persons at GSP, again, many of whom had been identified as having mental illness, only caused their mental conditions to get significantly worse. (*Id.*, ¶¶ 58-60.) However, while GDC policy requires access to mental health services, incarcerated individuals often do not have the ability to see a psychiatrist or other mental health professional, they are often not provided with prescribed mental health medications for months if not longer, and presumably because GSP had half of the mental health counselors required, said counselors fail to adequately check in with that population. (*Id.*, ¶¶ 62-67.)

In addition to the lack of mental health staff, GDC failed to provide adequate levels of correctional officers and levels of supervision. 70% of the officers needed were not there. (*Id.*, ¶ 38.) Officers fail to perform the required and routine rounds, and incarcerated persons know that they are often completely unsupervised overnight and during entire weekends. (*Id.*, ¶¶ 39-40.) They are also aware that officers are unable to respond to actual emergencies because officers are at times expected to secure multiple buildings at the same time. (*See id.*, ¶ 48.) This case is not about whether the prison was comfortable. Notwithstanding all of the other major deficiencies at GSP, society would most certainly consider a prison that is largely and completely unsupervised by corrections personnel for significant periods of time, especially in light of the previous instances of violence and death,

to violate contemporary standards of decency to expose anyone unwilling to such risks.  *See Chandler*, 379 F.3d at 1289.  Critically, it is because of these circumstances in which DOJ has determined that GDC is deliberately indifferent to the risk of harm to incarcerated persons.  U.S. Dep't of Justice Civil Rights Div. at 73-78.  Accordingly, Plaintiff's allegations meet the objective component of showing that the conditions at GSP constituted cruel and unusual punishment.

Plaintiff's allegations also should have also been seen to have met the subjective element.  A "prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Chandler*, 379 F.3d at 1289 (quoting *Hudson*, 503 U.S. at 8). This Court should find that the allegations against Commissioner Ward, Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, and Captain Glover[6] were sufficient to establish the subjective element of the instant claim.  As a general matter, the deficient conditions and potential, resultant harm would have been obvious to any reasonable third-party observer. (*Id.*, ¶ 73.)  Additionally, there should be no question that the above-named Defendants who were assigned to work at GSP – Warden Bobbitt and Captain Glover – personally observed the alleged conditions of GSP on a regular basis and knew of the potential, resultant

---

[6] Similar to the discussion in the proceeding section, the district court only analyzed whether Plaintiff stated this claim against the aforementioned individuals. Accordingly, this Court's analysis should be limited to the same.

harms. The district court correctly determined that Plaintiff's allegations against each of these Defendants were sufficient to plausibly allege their subjective awareness of the conditions at issue. (*See* Doc. 51 at 28-31.) However, the district court erred in determining that the allegations that these Defendants failed to act were conclusory, and therefore, did not show how the risks were inextricably tied to each Defendant's conduct. (*Id.*)

At a 30,000-foot view, Plaintiff's allegations concerning the deficiencies at GSP fall into several major categories: deficient levels of staffing and a lack of supervision, inadequacies concerning the facilities and housing assignments, and major deficiencies in GDC's provision of mental health services. Commissioner Ward, Warden Bobbitt, and Captain Glover were specifically responsible for overseeing and supervising the correctional officers at GSP. (Doc. 37, ¶¶ 6, 9, 11.) Because the levels of staffing were inadequate, and specifically because each of these Defendants were aware of the problems with staffing and supervision and possible resulting harms, it is apparent that the actions and inactions of Commissioner Ward, Warden Bobbitt, and Captain Glover were inextricably tied to the inadequate levels of staffing and supervision and the resultant harms. Similarly, Commissioner Ward, Assistant Commissioner Holt, and Warden Bobbitt, being responsible for the facilities and housing assignments at GSP (*see id.*, ¶¶ 6-7, 8), had the power to but failed to address the risks arising from the

facilities issues described herein.  Finally, because Commissioner Ward, Director Jackson, and Warden Bobbitt were aware that incarcerated individuals were not receiving the appropriate mental health services, due in part to a lack of staffing, and because they had the power to take appropriate action but failed to do so (*see id.*, ¶¶ 6, 8-9), the risks posed by the deficiencies in mental health services were inextricably tied to these Defendants' inaction as well.  Accordingly, Plaintiff alleged sufficient factual allegations, taken as true, and beyond a formulaic recitation of the elements, to show that these Defendants were deliberately indifferent to the conditions of GSP to the extent that Mr. Mathis was deprived of his personal safety while incarcerated at GSP, and this claim should not have been dismissed.

### 3. Defendants failed to take any meaningful action to protect Mathis from known risks to his safety.

The district court further erred in dismissing Plaintiff's failure to protect claim against Commissioner Ward, Assistant Commissioner Holt, Director Jackson, Warden Bobbitt, Captain Glover, and Defendants Hall, Milliken, and Williams.  In order to establish a claim based on a prison official's failure to protect, a plaintiff must show, objectively, "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citing *Helling,* 509 U.S. at 35). To meet the subjective factor, a plaintiff must show "that a defendant [knew] of and disregard[ed] an excessive risk to an inmate's health or

safety." *Haney v. City of Cumming*, 69 F.3d 1098, 1102 (11th Cir. 1995) (citations omitted).   As discussed above, the conditions for which Mr. Mathis was subjected posed a substantial risk of serious harm, and the district court erred in finding otherwise.   (*See* Doc. 51 at 37.) This should have been true either about the concern for Mr. Mathis' safety at the hands of other inmates, generally, or with specific regard to Mr. Johnson.   Moreover, each of the Defendants had subjective knowledge of the risk of serious harm to Mr. Mathis, they disregarded those risks, and they acted with more than gross negligence. *See Hoffer v. Sec., Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)).

Captain Glover and Defendants Hall, Milliken, and Williams were aware of the risk to Mr. Mathis as they had not only observed Mr. Mathis' reaction to that risk, Mr. Mathis specifically told them.   On February 6, 2021, approximately twenty days before Mr. Mathis was murdered, Mr. Mathis attempted to escape from his assigned dorm. (Doc. 37, ¶ 95.) Mr. Mathis refused instructions to return to the dorm to the extent that a supervisory officer, Captain Glover, had to call for backup and help to restrain Mr. Mathis.   (*Id.*, ¶¶ 96-98.)   Once Defendants Hall, Milliken, and Williams arrived, Mr. Mathis became purportedly more physically combative in resisting the restraints and in returning to his dorm. (*Id.*, ¶ 99.) During this encounter, Mr. Mathis explained that he had attempted to leave his

assigned dormitory because he had learned that other offenders in the dorm had made threats to Mr. Mathis' life. (*Id.*, ¶ 100.) As would have been further established in discovery, subsequent conversations that Mr. Mathis had with his family suggest that this was not the first time that Mr. Mathis had expressed his concerns to GSP staff, but that his concerns had all been ignored. (*See id.*, ¶ 105.) It is a fair assumption that GSP's medical and mental health staff were also aware of Mr. Mathis' concerns since that was the explicit reason that Captain Glover and Defendants Hall, Milliken, and Williams said they escorted Mr. Mathis to that unit. (*Id.*, ¶ 106.)

GSP staff, including Warden Bobbitt, were also aware that Mr. Mathis had previously been attacked by an inmate merely a few months earlier. (*Id.*, ¶ 92.) On September 14, 2020, Mr. Mathis was escorted to a Tier II unit after he was assaulted by another incarcerated individual, receiving multiple puncture wounds in the process. (*Id.*) Indeed, Mr. Mathis refused to say who was responsible for the assault or what had occurred. (*Id.*) However, Warden Bobbitt was aware of the inmate attack because he reviewed the incident report. (*Id.*) Still, GDC officials failed to further investigate the incident. (*Id.*)

On February 6, 2021, it was specifically Mr. Mathis' concerns about threats made to his life that raised GDC's concern for Mr. Mathis' mental health. (*Id.*, ¶ 106.) As a result, Warden Bobbitt had to have been aware of the ongoing threat to

Mr. Mathis' safety based on the recommendation that GSP's mental health staff made to Warden Bobbitt to place Mr. Mathis in a Specialized Mental Health Unit ("SMHTU") and Warden Bobbitt's review of his correctional officers' incident report. (*See id.*, ¶¶ 108, 114.) The same information was then forwarded to Director Jackson for her review and approval in her role as the State Mental Health Director. (*Id.*, ¶ 109.) The head of the Facilities Division, Assistant Commissioner Holt, was also required to review and approve the assignment. (*Id.*, ¶¶ 110-11.) Similarly, given that GDC's policies required Commissioner Ward, Assistant Commissioner Holt, Director Jackson, and Warden Bobbitt to make certain findings concerning Mr. Mathis' mental health when giving their respective approval to move him into a Tier II dormitory (*id.*, ¶ 118), it follows that all of these Defendants had subjective knowledge of the risk of harm to Mr. Mathis.

While Defendants argue that they were not aware of any specific threat posed by the cellmate with whom Mr. Mathis was assigned, such a contention is without merit. (*See* Doc. 25-1 at 17.) When Mr. Mathis was assaulted by another inmate in September 2020, Defendants did not take any legitimate measures to investigate the circumstances under which Mr. Mathis was attacked. (Doc. 1, ¶ 92.) Moreover, even though GDC was aware that Mr. Mathis had been attacked by another inmate, receiving puncture wounds in the process, GDC's incident report erroneously stated that Mr. Mathis had not been injured during the incident. (*Id.*, ¶¶

92-93.) It is also clear that, even when Defendants became aware that Mr. Mathis had legitimate concerns for his safety merely a few months later, Defendants did not take sufficient measures to ascertain the causes of Mr. Mathis' concerns. (*See id.*, ¶¶ 94-102.) The same is true even as all levels of GDC's management became aware of Mr. Mathis' allegation. (*Id.*, ¶¶ 107-16.) To the extent that Defendants were unaware of any risk posed by Mr. Mathis' cellmate, that is only because Defendants did not take any adequate measures to discover any of the details about Mr. Mathis' concern.

Moreover, as discussed further below, information obtained after the dismissal of this case reflects that, at the very least, Captain Glover and Defendant Mendez, were specifically aware of the threat posed by Mr. Johnson. Merely three days before Mr. Johnson killed Mr. Mathis, Mr. Johnson cut off part of another incarcerated individual's nose. Presumably, the other Defendants were aware of Mr. Johnson's previous assault of another person as well.

Regardless, the concerns that Mr. Mathis did raise were enough for the mental health staff to recommend Mr. Mathis' placement into GDC's SMHTU. (*Id.*, ¶ 108.) According to GDC policies, inmates placed in the SMHTU program must be assigned to a single occupancy cell, unless specific justification for double-bunking has been made by GDC staff. (*Id.*, ¶¶ 112.) It is reasonable to assume that there is a reason for such a policy, including to protect the safety of

inmates whose circumstances would make it ill-advised to assign such a person to a double-person cell. Yet, Defendants did not provide Mr. Mathis with a single-occupancy cell, despite his contention that he was receiving threats from unidentified individuals in his dormitory. (*See id.*, ¶¶ 100, 113.) Even if none of the Defendants were aware of the specific threat posed by Mr. Johnson, they were all aware that Mr. Mathis' safety was at risk at the hands of some other, unknown inmate, but they assigned Mr. Mathis to a cellmate anyway, even though that was in violation of GDC's own policies.

The district court erred in dismissing the failure to protect claim because Plaintiff established that each of the Defendants were aware that there was a risk of serious harm toward Mr. Mathis by another, unknown inmate. Moreover, as discussed below, discovery would have led to the additional conclusion that, at the very least, Captain Glover and Defendant Mendez were specifically aware of the threat posed by Mr. Mathis's new cellmate. After they became aware of these threats, Defendants either moved Mr. Mathis into the same cell as his would-be murderer, or they failed to remove him from the same, and Defendants otherwise did nothing to prevent the threat posed to Mr. Mathis and his safety. This gross negligence on the part of Defendants not only created a very real risk to the safety of Mr. Mathis – his concerns were substantiated when he was killed.

**D.    Defendants' Should Not Be Permitted to Benefit from Facts that Defendants Prevented Plaintiff from Ascertaining Prior to a Pre-Discovery Dismissal.**

This Court should not allow Defendants to reap the benefits of dismissal when facts that Plaintiff could not have sought in discovery, and for which Defendants otherwise refused to produce, certainly would have precluded that dismissal. Specifically, Defendants prevented Plaintiff from obtaining information reflecting that at least some of the same individuals who were aware of Mr. Mathis' concern for his safety at the hands of another inmate, and who were responsible for or aware of the reassignment of Mr. Mathis to the cell where he died, were also aware of the specific threat that was posed by Mr. Mathis' cellmate and killer based on an incident that occurred *three days before Mr. Mathis was murdered*.

While the parties were not permitted to engage in discovery, Plaintiff submitted several requests to GDC under the Georgia Open Records Act, O.C.G.A. § 50-18-70, *et seq.*, for documents pertaining to Mr. Mathis and the facts of this case. (*See* Doc. 37, ¶ 20.) Indeed, GDC provided several incident reports in response to the February 18, 2022 request; however, GDC refused to produce almost all of the associated, "supplemental reports," which would have specifically provided the description or narrative of the events for which each incident report relates. The sole exception was that GDC provided the supplemental report

43

concerning the February 6, 2021 incident, described herein, in which Mr. Mathis specifically advised GSP staff of the threats to his life, and that was prepared by Captain Glover.

In response to the second of Plaintiff's requests under the Open Records Act (*see id.*), GDC produced an incident report, also prepared by Captain Glover, concerning Mr. Johnson's assault on another incarcerated person named Tyrone Adolph James on February 22, 2021.  While this incident report shows that Mr. Johnson used a "handmade metal weapon," the report also states that no offender weapons were used, there was no contraband involved in this incident, and there are no additional details of what actually occurred.  Defendant Lisa Mendez, who was one of the correctional officers who found Mr. Mathis' body, was listed as being involved in this incident.  Despite Plaintiff's best efforts, this scant production did not allow for Plaintiff to independently verify these facts, or find out any additional information concerning the same.

However, in the preparation for the instant filing, the undersigned happened to again search Mr. Johnson's "Find an Offender" page with GDC, and learned that a new criminal conviction had been added to this page since the time this report had last been checked during the proceedings below. The undersigned then contacted the Superior Court for the county where Mr. Johnson was convicted and requested a copy of those records.  Apparently, Mr. Johnson was indicted on

October 19, 2021 for Aggravated Battery, when Mr. Johnson "did maliciously cause bodily harm to Tyrone Jones by seriously disfiguring said person's body *by partially severing his nose*…" on February 22, 2021. (emphasis added). Mr. Johnson pled guilty to this felony charge in 2024 shortly after the Rule 12 Motions at issue in this appeal had been fully-briefed. *See State of Georgia v. Semaj Lynquell Johnson*, No. 2021-R-307-WW (Ga. Sup. Ct., Tattnall Cnty. May 10, 2024). As a result, GDC refused to provide information in response to the Open Records Act requests that would have allowed Plaintiff to know and allege that Mr. Mathis' attacker had cut off part of another incarcerated individual's nose *merely three days before Mr. Johnson killed Mr. Mathis*. Based on this information, GDC, and certainly Captain Glover and Defendant Lisa Mendez, did not have a valid argument that they were not aware that Mr. Johnson posed a risk of harm to Mr. Mathis,[7] especially considering the specific threats previously disclosed by Mr. Mathis to the officers himself.

---

[7] (Contra Doc. 27 at 8 ("Plaintiff has not alleged any fact that would have put [Director Jackson] on notice that Inmate Mathis faced a substantial risk of harm from his cellmate."); Doc. 34 at 7 ("Plaintiff has not alleged any facts suggesting that Inmate Mathis faced a known and substantial risk of harm from his cellmate and eventual killer [Mr. Johnson]."); Doc. 35 at 1 ("One of the fatal flaws of Plaintiff's complaint is that it fails to allege that Dr. Jackson or any Defendant was aware of a specific threat posed by inmate Mathis' cellmate."); Doc. 40-1 at 20 ("… Plaintiff has not alleged what fact each Defendant knew or should have known that would have alerted them that Inmate Mathis faced a substantial risk of harm from Inmate Johnson."); Doc. 49 at 9 ("But these Defendants responded

Accordingly, GDC was aware that the same individual who killed Mr. Mathis in the overnight hours between February 25, 2021 and February 26, 2021, had been indicted (now convicted) of a crime where he cut off part of another inmate's nose on February 21, 2021. However, because Mr. Mathis is deceased, this matter did not proceed to discovery, and because GDC declined to provide any detail concerning the February 21, 2021 incident in response to Open Records Requests,[8] there was no way for Plaintiff to have alleged these additional facts that reflect just how much of a risk Mr. Johnson really was. Indeed, these facts do not appear on the record below, but this just one example of what can occur when, as discussed above, a plaintiff is held to standards far and above what is required under the standards of pleading, and the defendants have critical information that they are under no obligation to provide to the plaintiff and survivor of the deceased victim.

Had this information been known or made available to Plaintiff, the district court certainly would have reached a different conclusion. (*See* Doc. 51 at 41 ("… Plaintiff's allegations concerning Mr. Johnson's characteristics, both physical and

---

reasonably by taking Inmate Mathis to receive medical care [after the February 6, 2021 incident], which led to his placement in segregation and away from general population … Therefore, the alleged facts against these Defendants do not show deliberate indifference.").)

[8] GDC claimed that the supplemental report concerning this incident was exempt from disclosure pursuant to O.C.G.A. § 50-18-72(a)(4), and the argument contained herein is not intended to question the applicability or validity of that statutory exception.

personal, are insufficient to allege more than a mere possibility of harm. Because the allegations are insufficient to show Mr. Mathis was subject to a substantial risk of serious harm in the form of injury or death at the hands of another inmate, Plaintiff failed to allege Defendants failed to take reasonable measures to guarantee Mr. Mathis's safety in their custody.").) However, this conclusion was still erroneous, as discussed further above, given that Plaintiff alleged that Mr. Mathis had advised GDC officials of the specific threats against him.

### E.    Defendants' Qualified Immunity Defenses Are Not at Issue on Appeal.

The Court should decline to address Defendants' contention that they are entitled to qualified immunity because that matter was not considered by the district court. Defendants asserted, in both of their respective Motions to Dismiss, that they were entitled to qualified immunity on all of Plaintiff's claims, both because there was no underlying constitutional violation, and even if there was, Defendants were not on notice that their actions violated clearly established laws. (Doc. 39 at 11-12; Doc. 40-1 at 20-22.) Defendants were not entitled to qualified immunity because, as Plaintiff argued below (*see* Doc. 46 at 24-26), Defendants were on notice of their duties under the Eighth and Fourteenth Amendments to the United States Constitution to take reasonable measures to guarantee the safety of an individual like Mr. Mathis in their custody, and that Defendants knowingly

subjected Mr. Mathis to conditions that violated such clearly established right. The district court dismissed all of Plaintiff's claims, without addressing the qualified immunity defense. (*See generally* Doc. 51.)

Because the district court dismissed each count upon a finding that Plaintiff failed to state a claim, but did not address the issue of qualified immunity, this Court should decline to address the defense in the first instance. *Copeland v. Ga. Dep't of Corrs.*, 97 4th 766, 780-81 (11th Cir. 2024) (citing *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1348 (11th Cir. 2022)). This Court is "… a court of review, not a court of first review." *Stansell*, 45 F.4th at 1348 (quoting *Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1266 (11th Cir. 2019)). To the extent that this Court reverses or vacates the district court's dismissal of all of Plaintiff's claims, the issue of Defendants' qualified immunity defense should only be considered on remand and not in the instant appeal. *See Copeland*, 97 4th at 781. (vacating grant of summary judgment, leaving element not initially considered by district court for consideration on remand).

## **CONCLUSION**

Accordingly for the above and foregoing reasons, Plaintiff-Appellant Christopher Dewayne Bonner respectfully requests that this Court find that the district court erred in dismissing claims against fictious-Defendants *sua sponte*

because the allegations against those Defendants met the limited exception, and that its conclusion that the Complaint constituted a shotgun pleading was incorrect and it was an abusive of discretion to dismiss those claims. This Court should further find that Plaintiff-Appellant Christohper Dewayne Bonner adequately alleged the substantive of his claims, and reverse and remand this matter for further preceding.

Respectfully submitted, this 3rd day of February, 2025.

DEBRA G. GÓMEZ
Georgia Bar No. 300509

GÓMEZ LAW GROUP, LLC
1469 Oglethorpe Street
Macon, GA  31201
(478) 744-0905 (t)
(478) 845-3554 (f)
dgomez@gomezlawgroup.com

KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
*Attorneys for Plaintiff-Appellant*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,</u>
## <u>TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑   this document contains  11,807 words, or

☐   this brief uses a monospaced typeface and contains _____ lines of text.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☑   this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14 point font, or

☐   this document has been prepared in a monospaced typeface using Microsoft Word for Microsoft 365 with _____.

This 3rd day of February, 2025.

KENNETH E. BARTON III
*Counsel for Plaintiff-Appellant*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served the foregoing BRIEF OF APPELLANT to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participants:

Shelley T. Milton, Asst. Atty. Gen.
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
smilton@law.ga.gov
*Attorney for GDC Defendants*

Paul Henefeld, Esq.
Henefeld & Green, P.C.
3017 Bolling Way NE, Suite 129
Atlanta, Georgia 30305
phenefeld@henefeldgreen.com
*Attorney for Defendant J. Jackson*

This 3rd day of February, 2025.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Plaintiff-Appellant*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com